ANDREA T. MARTINEZ, United States Attorney (#9313)
JACOB J. STRAIN, Assistant United States Attorney (#12680)
CARL D. LESUEUR, Assistant United States Attorney (#16087)
TYLER L. MURRAY, Assistant United States Attorney (#10308)
Attorneys for the United States of America
111 South Main Street, Ste. 1800 • Salt Lake City, Utah 84111
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>GAYLEN DEAN RUST,<br><br>                Defendant. | Case No. 2:19-cr-00164<br><br>**UNITED STATES SENTENCING MEMORANDUM**<br><br>Judge Ted Stewart |

> *We suffer alone and hope that somehow justice will be served and Gaylen will pay for what he has done.*
> *--Victim impact statement*

Judge Dee Benson always said that Utahns have a lot to be proud of—an incredible heritage, beautiful mountains, terrific skiing, caring and close-knit communities—but Utah's fraud problem is an embarrassment. The Rust Rare Coin Ponzi scheme is another chapter in that regrettable, embarrassing story. At its center is Gaylen Rust, who joins the ranks of notorious Utah fraudsters. His conduct merits, and the United States recommends, the Court order: (1) Gaylen Rust to serve a term of incarceration of **19 years**; (2) a restitution judgement of **$153,073,328.32** payable to the 568 victims in this case, to be joint and several with convicted co-defendants; (3) a forfeiture money judgement in the same amount as restitution; and (4) leave for the United States to dismiss, only as against Gaylen Rust, Count 3 of the Indictment.

## I.  GUIDELINE CALCULATION BY THE UNITED STATES

The Supreme Court has declared that, in determining an appropriate sentence, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."[1]  The United States calculates the defendant's guidelines as follows:

Count 1: 18 U.S.C. § 1349 (Wire Fraud Conspiracy):
    § 2B1.1(a)(1) Base Offense Level                        +7
    § 2B1.1(b)(1)(N) Loss amount: >$150,000,000      +26
    § 2B1.1(b)(2)(C) Substantial Hardship >25 Victims    +6

Count 2: 18 U.S.C. § 1956(h) (Money Laundering Conspiracy):
    § 2S1.1(a) Base Offense Level                           +7
    § 2B1.1(b)(1)(N) Loss amount: >$150,000,000      +26
    § 2B1.1(b)(2)(C) Substantial Hardship >25 Victims    +6
    § 2S1.1(b)(2)(B) Convicted of 18 U.S.C. § 1956       +2

Count 4: 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Securities Fraud):
    § 2B1.1(a)(1) Base Offense Level                        +7
    § 2B1.1(b)(1)(N) Loss amount: >$150,000,000      +26
    § 2B1.1(b)(2)(C) Substantial Hardship >25 Victims    +6

Grouping § 3D1.2, 3D1.4 = 1 Unit
Acceptance of Responsibility § 3E1.1(a)-(b) = -3
Total Offense Level = 38
Criminal History Category I = <u>235 to 293 Months</u>

## II.  18 U.S.C. § 3553 FACTORS SUPPORTING THE RECOMMENDED SENTENCE

"In sentencing defendants, district courts exercise a guided discretion within a range specified by Congress.  As Justice Cardozo wrote, a 'judge … is to exercise discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to the primordial necessity of order in the social life.'"[2]  Under USSG § 6A1.3, "[i]n determining the relevant facts,

---

[1] *Gall v. United States*, 552 U.S. 38, 49 (2007).
[2] *United States v. Smart*, 518 F.3d 800, 809 (10th Cir. 2008) (citation omitted).

sentencing judges are not restricted to information that would be admissible at trial. Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy."[3]

18 U.S.C. § 3553 provides a sentencing judge with the statutory framework to exercise discretion when fashioning an appropriate sentence. The § 3553 factors the Court is to consider in imposing a particular sentence support the recommended sentence in this case:

1. ***Nature and circumstances of the offense***:

This was an insidious crime. Hundreds of people gave millions of dollars to Rust Rare Coin for more than two decades as part of the "silver trading program" investment offering, and now they have lost everything. On May 8, 2019, a federal grand jury returned an indictment against Gaylen Rust ("Rust"), alleging that he engaged in both a Wire Fraud conspiracy and a Money Laundering conspiracy that began in 1996 and continued until law enforcement intervened on November 15, 2018. In colloquial terms, Rust conspired to operate a Ponzi scheme causing well over approximately $150 million in losses to over 500 victims.

Rust targeted family, friends, and fellow church members to invest in his "lucrative" silver trading program that involved the buying and selling actual physical silver bullion. However, forensic accounting proves that virtually all investor funds were diverted to unrelated failing businesses, to personal uses, and to make payments to other investors. For example, investor funds were used to fund unprofitable music recording studios and an online music tutorial video database referred to by the coconspirators as the "Musician's Toolkit". Rust also used investor funds to pay mistresses for their companionship and to buy expensive

---

[3] *See United States v. Pawelski*, 651 Fed. Appx 750, 780 (10th Cir. June 2, 2016) (unpublished)

thoroughbred racehorses that were entered into the Kentucky Derby.

The depth of Rust's shameless deception is chilling. A victim reported that Rust went so far as to attend the funeral of a victim's family member. Another reported that, days after her husband died, Rust fraudulently convinced this grieving widow in his office, along with her son and daughter to invest her savings and their inheritance in his supposedly wonderful investment opportunity. Another victim reported that Rust stole all of the money that was to be used to care for the victim's father who is in a rest home with Alzheimer's/dementia.

Rust financially destroyed the lives of his victims and indirectly damaged thousands more to feed his ego-driven facade. The victims in this case are humiliated, violated, and financially devastated. Many victims are beyond their financially productive years and had already retired or were headed for retirement—a fact Rust knew well. At Rust's brazen recommendation, many victims mortgaged their homes and leveraged retirement accounts to obtain the returns Rust promised. Some of the losses sustained by victims in this case represent decades of hard work—blood, sweat, and tears—all ripped away. Many are now coming to terms with the fact that their lifetime of effort and saving has evaporated. They have lost homes, farms, comfort, and security. One victim stated, "We have shed tears, struggled with stress, worry, confusion, disappointment, fear and betrayal." Another victim reported, "The loss of my life's savings, basically everything I have worked and saved over nearly 75 years all gone, has caused emotional, physical, economic, and health stress beyond my abilities, almost, to endure."

Everyone is left with an unanswered question: How could someone do something so despicable? Those guided by conscience cannot comprehend how someone could financially betray a loved one, a dear friend, or a family member. Conceptually, most people can understand the motivation behind a Ponzi scheme. But when confronted in real life, the moral

depravity required to carry out such a scheme is so alien, most will fail to perceive it even as a remote possibility. Rust preyed on this natural blind spot and like most confidence men, he deployed his prodigious ability to manipulate and persuade in indefatigable pursuit of his fraud.

In imposing sentence, the Court should consider the lives devastated by Rust's scheme. Many of Rust's victims now face significant personal family challenges. All combined, his victims have lost $153 million—money that should have been dedicated to life's various particulars and worthwhile endeavors. The Court should be mindful of the opportunities, dreams, hopes, goals, and aspirations that Rust's fraud has obliterated from society. Rust's fraud will affect his victims for the rest of their lives and will impact their families for generations.

2. *History and characteristics of the defendant*:

Gaylen Rust is a prodigious, shameless liar who brought about the complete financial ruin of hundreds of victims. Rust has no criminal history, but for decades lied to his victims. His lies were remorseless and relentless. He was not trading silver, and he had no way to generate returns. He stole from schoolteachers, police officers, homemakers, accountants, active-duty military members, farmers, widows, etc. Rust sat face to face with frugal, hardworking, trusting, and kind people, and he told and retold his fantastical lies. He looked into the eyes of his friends and family and lied to steal their money and lied to keep their money. He stole from them one by one, day by day, for decades. His fraud took sustained effort, deliberation, and planning.

Rust's motivation appears to have been ego and greed. He set himself up as a faithful, church-going man. He pretended to be a philanthropist, and a pillar of the business community. He promised some investors, including those who had just lost loved ones, that his program

would help them in their darkest financial times. He apparently loved the adulation and respect that came as a result. But it was all a lie. He was running a massive Ponzi scheme, funding self-aggrandizing vanity projects, and lining the pockets of his mistresses. He even tried to keep up his façade of piety on the night that law enforcement searched his businesses. That night, on November 15, 2018, he tried to rationalize and justify what he had done. He told the court-appointed receiver that the reason he did what he did with investor funds was to reduce teen suicide. Rust said that Musician's Toolkit (one of his vanity projects) was a mechanism to get kids involved with music, which would help prevent them from committing suicide. With a complete lack of empathy for his victims, Rust told the receiver that me may go to jail for what he has done, but that he would do it all again. An objective assessment of defendant's history and characteristics supports the United States' sentencing recommendation.

3. ***The need for the sentence (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate vocational training, medical care, or other correctional treatment in the most effective manner***:

    The recommended sentence reflects the seriousness of the offense, provides just punishment, promotes respect for the law, and affords adequate deterrence (both specific and general) while at the same time recognizing Rust's guilty plea. Part of a just punishment is to leave no doubt in the mind of the defendant, the victims, and third-party observers that the Court has fully considered the gravity of the criminal conduct and reacted accordingly.

    *Just Punishment and Seriousness of the Offense*: The recommended sentence of 228 months (19 years) will provide a just punishment for Rust and reflect the seriousness of his offense. This would be among the highest sentences handed down in for a white-collar case in Utah in recent memory. It ensures that Rust, who is in his early sixties, will remain in prison for

the remainder of his working life and beyond. The sentence is seven months below the guideline range. This small departure is justified by Rust's post-indictment cooperation with the receiver and his counsel, helping them to unravel the financial web he had spun over the years of his fraud, saving time and money that will be used to compensate victims through the receivership.

*Specific Deterrence*: Based on the extensiveness of the fraud, the United States submits that Rust is at a very high risk for recidivism. His past actions and character demonstrate that, given the chance, he will continue: he is unwilling to stop deceiving others, and adept at justifying to himself his deceitful conduct. A 19-year sentence is necessary to deter Rust from future crimes and to protect the public.

*General Deterrence*: There is a particular need here in Utah to deter others from committing similar crimes. As this Court is aware, the state of Utah is known for being a hotbed of rampant fraud and white collar crime.[4] Salt Lake City has been named by the Wall Street Journal as the "Fraud Capital of America."[5] Utah has suffered "a tsunami of Ponzi operations, pyramid schemes, mortgage and bank fraud and other financial crimes that helped propel Utah to infamous heights nationally."[6] It has been reported that the loss figures in Utah fraud cases exceed many cases out of large metropolitan areas.[7] Such crime affects not just immediate victims, but generations of victims. Fraudsters often find success in Utah because

---

[4] THE ECONOMIST, Affinity Fraud, Fleecing the flock: The big business of swindling people who trust you, January 28, 2012 ("The state thought to have the most affinity fraud per head is Utah. . . ."); Byline: In Our Opinion for the Deseret News, *Fraud Registry*, DESERET MORNING NEWS, May 19, 2015 ("The new fraud registry is unique in the country, but so is the prominence of such crime in our community."); Janice Peterson, *Investment fraud rampant in Utah County*, DAILY HERALD, Feb. 28, 2010.
[5] Robert Brazell, *Shyster Extraordinaire*, DEEP CAPTURE, Dec. 29, 2015.
[6] Tom Harvey, *FBI agent has seen Utah through flood of fraud*, THE SALT LAKE TRIBUNE, June 24, 2012.
[7] *Id*. (quoting FBI S.A. James Malpede) ("The amount of fraud is so great that the FBI in Utah largely concentrates only on cases involving investments of $10 million or more.")

"they appear to be good and honest people with an outgoing, attractive personality."[8] It is estimated that white collar scams have cost thousands of Utah victims billions of dollars in recent years.[9] The FBI recently ranked Utah as one of the top five states for white-collar fraud in America.[10] Utah is the only state with a dedicated regional Securities Exchange Commission office that services no other location. Utah's fraud epidemic has reached such significant proportions, state lawmakers adopted the nation's first-ever white collar crime offender registry to include photos, names and aliases of Utah State's fraudsters.[11]

Section 3553(a)(2)(B) requires the Court to impose a sentence that "affords adequate deterrence to criminal conduct." When Congress enacted Section 3553(a), it noted the importance of general deterrence and specifically sought to curb judicial leniency in the context of economic crimes: "Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."[12] This same goal is also reemphasized by the sentencing guidelines: "One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes."[13] The Seventh Circuit likewise emphasized the need to resist judicial leniency toward white collar criminals:

> It is natural for judges, drawn as they (as we) are from the middle or

---

[8] *Id*.
[9] Eric S. Peterson, *Uncle Scam*, SALT LAKE CITY WEEKLY, Dec. 9, 2010 ("In June, state and federal investigators announced that Utahns may have lost as much as $1.4 billion in fraud in 2009. 'Utah is supposedly the fraud capital, and that's our urban folklore,' [Salt Lake County Sheriff Jim] Winder says. 'But whatever we've been doing here, it hasn't been hugely effective.'")
[10] *See* Ben Winslow, *Feds, Utah Leaders Launch Campaign to Educate People about Fraud Problem*, FOX13 NEWS, *available at* http://fox13now.com/2017/04/05/feds-utah-leaders-launch-campaign-to-educate-people-about-fraud-problem.
[11] Wendy Leonard, *White Collar Crime Registry First in Nation*, DESERET MORNING NEWS, March 14, 2015.
[12] 62 S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.S.C.A.N. 3182, 3259.
[13] *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).

> upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.[14]

The Eleventh Circuit identified economic crime as a prime candidate for deterrence because it is "'more rational, cool, and calculated than sudden crimes of passion or opportunity.'"[15] Specifically, the cost-benefit analysis engaged in by white collar defendants is susceptible to influence through "serious punishment."[16]

This case represents the quintessential Utah fraud scheme. Likeminded fraudsters must be deterred through an expectation of just punishment should they follow Rust's footsteps. A significant sentence is critical in this effort.

4. ***The need to provide restitution to any victims of the offense***:

It is unlikely that Rust will ever be able to repay the full restitution amount due and owing to his victims. To achieve justice for the victims in this case who will likely never be made whole, a significant period of incarceration is appropriate in addition to the order of restitution. The mandatory restitution amount to be entered in this case is $153,073,328.32. The United States requests that the Court order the restitution payments to be made to the list of victims provided to Probation.

### III. RECOMMENDATION BY THE UNITED STATES

Accordingly, the United States recommends a term of incarceration of **228 months**

---

[14] *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir.1999) (citation omitted).
[15] *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).
[16] *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

followed by three years of supervised release. The United States also recommends the Court order **$153,073,328.32** in restitution to be paid to the list of 568 victims provided to Probation. Finally, the United States recommends the Court should order a restitution payment plan of $500 per month while the defendant is not in custody.

## IV.     RECOMMENDED RELEASE CONDITIONS

In addition to the conditions of supervised release recommended by Probation, the United States recommends the following:

- The defendant is to undergo mental health evaluation and complete any recommended treatment, as directed by the probation officer, and take any mental health medications as prescribed.

- The defendant shall not be employed in any fiduciary capacity or any position allowing access to credit or personal information of others.

## V.     STATEMENT OF GOOD FAITH

As required by DUCrimR 32-1(b) the United States has conferred in good faith with opposing counsel and with the probation office in an attempt to resolve any disputed matters.

## VI. CONCLUSION

Rust ran an enormous Ponzi scheme and lied to his investors about how he would spend their money. His actions resulted in financial losses of over $153 million. Given these facts, the Court should impose a sentence consisting of 19 years (228 months) in prison, three years of supervised release, and an order restitution in the amount of $153,073,328.32. Such a sentence is sufficient, but not greater than necessary, to satisfy the 18 U.S.C. § 3553 factors.

Respectfully submitted,

ANDREA T. MARTINEZ
United States Attorney

*/s/ Jacob J. Strain*
JACOB J. STRAIN
Assistant United States Attorney